# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 4073 | **DATE** | 12/5/2002 |
| **CASE TITLE** | Clyde Ammons vs. Aramark Uniform Services, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendant's motion to strike the testimony of Susan Entenberg and portions of plaintiff's local rule 56.1(b) response is granted. Plaintiff's motion for summary judgment is denied. Defendant's motion for summary judgment is granted. Enter memorandum opinion and order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| ✓ | No notices required, advised in open court. | | | | **Document Number** |
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | DEC 0 6 2002 | | |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | | | |
| ✓ | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge. | | date mailed notice | | |
| SLB | courtroom deputy's initials | U.S. DISTRICT COURT CLERK 02 DEC -5 PM 12:59 | Date/time received in central Clerk's Office | mailing deputy initials | |

| | | |
|---|---|---|
| CLYDE AMMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 01 C 4073 |
| v. | ) | |
| | ) | |
| ARAMARK UNIFORM SERVICES, INC., | ) | Judge John W. Darrah |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Clyde Ammons ("Ammons"), commenced an action against Defendant, Aramark

Uniform Services, Incorporated ("Aramark"), alleging that he was terminated from his employment

in violation of the American with Disabilities Act ("ADA"), 42 U.S.C. § 12203(a). Before this

Court are the parties' Motions for Summary Judgment and Defendant's Motion to Strike the

Testimony of Susan Entenberg and Portions of Plaintiff's Local Rule 56.1(b) Response.

<u>1. Motion to Strike Expert Testimony and Report</u>

Defendant seeks to strike the testimony of Plaintiff's expert, Susan Entenberg ("Entenberg"),

because it is unreliable and lacks proper foundation.

Federal Rule of Evidence 702 allows expert testimony:

> If scientific, technical, or other specialized knowledge will assist the
> trier of fact to understand the evidence or to determine a fact in issue,
> a witness qualified as an expert by knowledge, skill, experience,
> training or education may testify thereto in the form of opinion or
> otherwise.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) *(Daubert)*, the Supreme

Court established a two-part inquiry for assessing proffered testimony under Rule 702. Such testimony is admissible if the "expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592. The first prong tests the reliability of the testimony, and the second prong tests the relevance of the testimony. This test is applied to all proffered expert testimony, be it scientific, technical or specialized in nature. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Trial courts use four factors when weighing reliability: (1) whether the expert's technique or theory has been tested; (2) whether it has been subjected to peer review; (3) its known or potential error rate; and (4) whether it enjoys general acceptance within the relevant community. *Daubert*, 509 U.S. at 593-94. The party seeking admission of the expert testimony bears the burden of proving that the proposed testimony meets the above requirements. *Frey v. Chicago Conservation Ctr.*, 119 F. Supp. 2d 794, 797 (N.D. Ill. 2000).

Furthermore, while the courts are flexible in their application of *Daubert*, "there is no requirement that judges apply only those criteria that the plaintiffs believe are important." *Bourelle v. Crown Equip, Corp.*, 220 F.3d 532, 537 (7th Cir. 2000). Subjective tests may be used by experts, and their use nullifies the applicability of some of the *Daubert* factors. However, subjective tests do not nullify all the factors. *See Frey*, 119 F. Supp. 2d at 797. In determining reliability, the court "must determine whether the expert is qualified in the relevant field and whether the methodology underlying the expert's conclusions is reliable." *Masters v. Hesston Corp.*, 291 F.3d 985, 991 (7th Cir. 2002).

Here, Ammons' expert is a vocational rehabilitation counselor who evaluated Ammons in September 1998 as part of his workers' compensation claim. The parties do not dispute Entenberg's qualifications as an expert.

2

In October 1998, Entenberg prepared a vocational rehabilitation evaluation regarding Ammons. The evaluation was based on her interview with Ammons, her review of Ammons' medical records, her general background, training, and experience, and a review of the job description of a maintenance engineer in the Dictionary of Occupational Titles. In this evaluation, Entenberg concluded that Ammons was restricted to a sedentary occupation or a desk job. She found that Ammons' lifting restriction was at the light/medium level, but his other physical restrictions were at the sedentary level. She concluded that Ammons was not capable of returning to his maintenance engineer position as it was generally performed because of the standing, walking, kneeling, and other physical requirements involved in the position. Entenberg knew of no accommodations that would have allowed Ammons to perform the nonstationary aspects of his job. Entenberg concluded that "Ammons is precluded from his past work". Defendant does not take issue with this report.

Entenberg was also retained by the Plaintiff in the instant suit. Entenberg conducted an inspection of the plant where Ammons worked and interviewed Ammons' former supervisor and a former coworker. After the tour of the plant and interviews, Entenberg was deposed and submitted an expert report. In her second expert report, Entenberg now concluded that Ammons could perform "the vast majority" of his job functions. Entenberg did not re-interview Ammons for her second report.

At her June 2002 deposition, Entenberg admitted that she was not familiar with several pieces of equipment and items that are listed in Aramark's Preventative Maintenance Manual. Entenberg also testified that she "imagined" that machines or part of the plant would not need to be repaired at all or that it would only be repaired occasionally. During her tour of the plant, Entenberg

3

did not observe anyone actually repairing or maintaining any equipment; and she could not form an opinion as to whether Ammons was capable of maintaining and repairing these items in view of his physical restrictions. However, Entenberg testified that her opinion of Ammons' ability to do his job changed following the tour of the plant.

Based on the above, Ammons has failed to establish that the opinions set forth in Entenberg's second deposition and expert report are reliable. Entenberg based her opinion, in part, on her tour of the facility. It was the tour of the facility which prompted Entenberg to reverse her prior conclusion as to Ammons' ability to do his job in light of his restrictions. However, Entenberg admits that she did not observe any repairs being conducted while on the tour and that she did not observe all of the equipment and machinery that Ammons could be called on to maintain or repair. Although she did not observe all of the equipment or any maintenance being conducted, she could "imagine" that Plaintiff could conduct the maintenance. Entenberg also failed to review the sworn deposition testimony of the Ammons' former supervisor and former coworker. In addition, Entenberg failed to re-interview Ammons after at least three years' time had elapsed from her previous interview and report in which she concluded that Ammons was not capable of returning to his maintenance engineer position.

Furthermore, Entenberg opines that Ammons can perform "the vast majority" of his job functions while admitting in her deposition that she was not familiar with several pieces of equipment in Defendant's plant and that she was not able to form an opinion as to whether Ammons was capable of maintaining and repairing such items in light of his physical restrictions. In light of her inability to form an opinion concerning this equipment, her conclusion that Ammons could perform "the vast majority" of his job functions is not based on any specific methodology applied

4

to the facts but is only unsupported speculation. Such speculation renders her opinion unreliable. *See Goodwin v. MTD Prod., Inc.*, 232 F.3d 600, 609 (7th Cir. 2000) (expert's proffered testimony not admissible because it was based on speculation); *Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir. 1996) (an expert's opinion must be based on definite methods and procedures, not on subjective beliefs or unsupported speculation). As conjecture or speculation, the expert's opinions are not admissible. *See Daubert*, 509 U.S. at 590. ("'knowledge' connotes more than subjective belief or unsupported speculation"); *Mid-State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir. 1989) (court must look behind an expert's ultimate conclusion and analyze the adequacy of its foundation – expert's declaration that is full of assertions but empty of facts and reason is insufficient to create any issue of fact on summary judgment). Accordingly, Defendant's Motion to Strike the Testimony of Susan Entenberg is granted; and Entenberg's 2002 testimony and expert report are stricken.

## 2. Motion to Strike Plaintiff's Responses

Defendant next seeks to strike several of Ammons' responses to Defendant's proposed statements of undisputed facts.

A party opposing a motion for summary judgment must serve and file, in response to the movant's Local Rule 56.1(a)(3) statement of undisputed facts, "a response to each numbered paragraph in the moving party's statements, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon...." The material facts set forth by a moving party are deemed admitted unless controverted by the statement of the opposing party. L.R. 56.1(b)(3)(B); *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1313 (7th Cir. 1995).

5

In order for the non-moving party to introduce new facts that go beyond a denial of the moving party's facts, the non-moving party must file "a statement, consisting of short numbered paragraphs ... including references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(b)(3)(B); *Dade v. Sherwin-Williams Co.*, 128 F.3d 1135, 1140 (7th Cir. 1997) (district court had discretion to refuse to consider additional facts submitted by non-moving party when non-moving party failed to comply with local rule).

Plaintiff moves to strike Ammons' responses to paragraphs 6, 11, 27, 30-35, 40, 44, 51-60, 66-68, 70, 73, 77, 80, 83-85, 98, 108-111, 113-117, 124-126, 129-131, 134-135, 143-146, 151, 153-154, 160-164, 166-174, 177, 179-182, 184-193, 197, and 200 because the responses either fail to cite facts supporting the denial or add new, unrelated facts. A review of these responses demonstrates that Ammons has either failed to cite facts supporting his denial or added new, unrelated facts in an attempt to deny the statement. Based on the above local rule and supporting case law, such responses are improper and, accordingly, are stricken.

Defendant seeks to strike Ammons' responses to paragraphs 36, 102, 147, and 203 because the responses fail to cite any part of the record in support of the denial. Such response is improper, and these responses are also stricken.

Defendant seeks to strike Ammons' responses to paragraphs 148-149 because the responses cite an entire deposition transcript without page references. Such references are improper, and these responses are stricken. *See Uhl v. Zalk Josephs Fabricators, Inc.*, 121 F.3d 1133, 1135 (7th Cir. 1997) (the court is "not required to sift through every transcript [Plaintiff has] filed to find testimony to back up his case ).

Defendant also seeks to strike Ammons' responses to paragraphs 13, 99-101, 103, and 183

because Ammons failed to admit or deny the stated allegation. Such responses are improper and are stricken.

Based on the above, the following responses are stricken and the statements of fact found within the paragraphs are deemed admitted: 6, 11, 13, 27, 30-36, 40, 44, 51-60, 66-68, 70, 73, 77, 80, 83-85, 98-103, 108-111, 113-117, 124-126, 129-131, 134-135, 143-149,151, 153-154, 160-164, 166-174, 177, 179-182-193, 197, 200, and 203.

### 3. Motions for Summary Judgment

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### BACKGROUND

Ammons was employed by Aramark from 1960 to November 9, 1999. Ammons' employment was covered by a collective bargaining agreement ("CBA") with Boilermakers Union Local 1248. His supervisor was Pat Malfeo ("Malfeo"). (Def.'s 56.1(a)(3) Statement ¶ 4). Under the CBA, Ammons was "red-circled" as a "Lead Mechanic", which meant that because of his length of service, he was offered a special title to match his pay scale. "Lead Mechanic" referred to the rate at which Ammons was paid. (Id., at ¶ 33). Barrington McPherson ("McPherson") is the head union steward and the chairman of the bargaining and grievance committee for the union. (Id., at ¶ 9).

Aramark provides uniform and apparel services. (Def.'s 56.1(a)(3) Statement ¶ 3). The plant in which Ammons worked is an old industrial laundry. (Id., at ¶¶ 13-14). The plant measures an area of approximately 250,000 square feet. (Id., at ¶ 15). The length of the multi-level plant is almost one block. (Id., at ¶¶ 16-17).

The first floor of the plant contains the boiler and washing machines and includes the load makeup area, the garment wash area, the garment tumbler area, the loading dock, the receiving dock, and the maintenance department. (Def.'s 56.1(a)(3) Statement ¶ 19). The second floor contains the ironers and dryers and includes the mending area, the towel-folding area, the soil room, the soil counting room, the merchandise room, and the garment makeup room. (Id., at ¶ 20).

The plant contains boilers that are approximately 10 feet tall, 10 feet wide, and 12 feet deep. Valves, switches, and pipes are located on top of each boiler. (Def.'s 56.1(a)(3) Statement ¶ 21). The washing machines in the plant are approximately 6 feet tall, 7 feet wide, and 5 feet deep, and can hold 600-800 pounds of laundry. (Id., at ¶ 22). The dryers within the plant are comparable in size to the washing machines. (Id., at ¶ 23). The plant also contains ironers, industrial sewing machines, and levelators, which are similar to elevators. (Id., at ¶¶ 24-26).

Equipment that requires maintenance and repair is located throughout the plant. (Def.'s 56.1(a)(3) Statement ¶ 27). During any given week, seven or eight maintenance mechanics work at the plant, each working an average of forty-four hours per week. (Id., at ¶ 29).

Ammons performed the duties of a boiler engineer and leadman at the plant. (Def.'s 56.1(a)(3) Statement ¶ 32). Boiler engineers at Aramark tend to the boiler, which includes repairing the boiler and its associated components, including motors and pumps. (Id., at ¶¶ 40, 43). They are also assigned tasks, including performing preventative maintenance and repair work, such as the

installation, repair, and relocation of machines; water line work; electrical work; and plumbing work. (Id., at ¶¶ 40, 42). Boiler engineers perform welding, pipe fitting, electrical work, boiler work, and mechanical repair to the same or greater extent than individuals working in lower maintenance department classifications. (Id., at ¶ 41). Boiler engineers and maintenance engineers perform preventative maintenance and repairs on the following pieces of equipment and objects: levelators, sewing machines, boilers, washers, dryers, ironers, conveyers, alarms, fences and gates, fire extinguishers, floors, lavatories, lighting, overhead piping, carts, the clarifier, air coolers, fans, air filters, a folder, fork trucks, heat reclaimers, heat sealers, heaters, label printers, lift tables, lint collectors, packaging machines, Ph-control systems, waste water pits, presses, pumps, scales, a separator, a sludge dewatering filter, soil counters, stackers or hydrofolders, tanks, tunnel finishers, unwinders, vacuum systems, valves, water filters, water systems, water softeners, winders, and on the plant building including, the roof, windows, the dock, the grounds around the building, and on vehicles. (Id., at ¶ 45).

In 1998, there were three boiler engineers at Aramark's Plant 701, Ammons, McPherson, and Jimmy Patel. These three individuals were responsible for covering a twenty-hour day. Sometimes, depending on scheduling, a boiler engineer would be at the plant by himself. (Def.'s 56.1(a)(3) Statement ¶ 47). As a boiler engineer, Ammons performed everything in the plant related to maintenance and repair. (Id., at ¶ 46). Ammons' job duties also sometimes included the duties of a "stationary engineer". The stationary engineer is responsible for boiler operations. Ammons' primary duty was maintenance and repair of equipment, but he would occasionally fill-in at the position of boiler-stationary engineer at the request of, or in the absence of, someone else. (Id., at ¶ 48). On a typical day, Ammons or other boiler engineers would spend approximately four hours

9

a day tending to the boiler and approximately four hours doing other maintenance work. (Id., at ¶ 50).

Ammons' position involved frequent climbing, standing, and walking. (Def.'s 56.1(a)(3) Statement ¶ 51). The position was considered to be heavy in exertion level, with lifting 100 pounds occasionally and 50 pounds frequently. (Id., at ¶ 52). Ammons understood the essential functions of his position to include frequent walking, standing, bending, stooping, and kneeling, climbing ladders, going up and down stairs, being able to work in tight quarters, and basic reading and writing skills. (Id., at ¶ 53).

Ammons' position required standing, sometimes for a continuous period of time, to repair equipment. (Def.'s 56.1(a)(3) Statement ¶ 54). The position required standing on ladders and climbing up on ladders to repair equipment. (Id., at ¶ 55). A maintenance employee might stand for as little as five minutes to as much as eight hours to repair and maintain a piece of equipment. (Id., at ¶ 56). McPherson estimates that he would stand approximately ninety percent of each day. (Id., at ¶ 57). Ammons' position also required doing welding, pipe work, working on conveyers, pinning up overhead tracks, working on hoists, and working underneath levelators. (Id., at ¶ 85).

The amount of climbing, walking, kneeling, and lifting Ammons was required to do varied, depending on the specific tasks he was doing on a given day. (Def.'s 56.1(a)(3) Statement ¶¶ 58, 62, 67, 69). Sometimes Ammons would be on a ladder all day. (Id., at ¶ 58). A ladder was required to repair the valves, switches, and pipes located on the top of the boiler. (Id., at ¶ 59). Ammons was also required to go up and down stairs, including having to climb three flights of stairs at a given time. (Id., at ¶ 60). Every morning and every night, Ammons was required to walk the length of the building to read meters. (Id., at ¶ 63). Additional walking was required throughout the day for

Ammons to get from one job to another or to go to the maintenance office to get tools. (Id., at ¶ 64). Sometimes Ammons was required to kneel for only five minutes at a time; while other times, he would kneel for an hour, two-and-a-half hours, or sometimes all day. (Id., at ¶ 67). The amount of weight and frequency of lifting that Ammons was required to lift included lifting 100 pounds two or three times a week and lifting an object between 50 and 100 pounds at least once a week. (Id., at ¶¶ 69-71).

The plant contained some pieces of equipment that could shut the plant down if they were not fixed properly. These pieces of equipment included the boiler feed pump, the boiler, the cold water pump, hot water pump, the gas booster for the boiler, and the burst pipe. (Def.'s 56.1(a)(3) Statement ¶ 72). Kneeling, standing, climbing, and lifting are required to fix some of the equipment that could shut down the plant. (Id., at ¶¶ 73-76). The lifting required to fix some this equipment amounted to 50 or 100 pounds. (Id., at ¶ 77).

Other equipment in the plant required kneeling, standing climbing, and lifting. (Def.'s 56.1(a)(3) Statement ¶¶ 80-85). To repair a levelator, a maintenance person might have to kneel in some situations, walk, and stand. (Id., at ¶ 80). To repair a washer, a maintenance person might have to kneel or stand. (Id., at ¶ 84).

On August 15, 1997, Ammons injured his knee while at work when he hit a brick wall after he moved out of the way of a hoist that had flown up. (Def.'s 56.1(a)(3) Statement ¶¶ 86-87). Ammons received treatment for his knee at Mercy Works ("Mercy") on the day he was injured. (Id., at ¶ 88). Ammons was off of work for approximately a week following the injury. (Id., at ¶ 89).

After returning to work, Ammons' knee continued to swell. (Def.'s 56.1(a)(3) Statement ¶ 90). Mercy then sent Ammons to see Dr. Mitchell Krieger ("Dr. Krieger"), an orthopedic surgeon.

(Id., at ¶¶ 12, 91). Ammons saw Dr. Krieger several times, and he ultimately diagnosed Ammons with chrondomalacia of his medial femoral condyle and literal tibial plateau. The condition impacted the weight-bearing surfaces of his knee joint. (Id., at ¶¶ 92-93). Ammons' condition was rated a 3 on a severity scale, with 1 being the least severe and 4 being the most severe. (Id., at ¶ 95).

Dr. Krieger conducted arthroscopic surgery on Ammons' knee due to the swelling and Ammons' complaints of pain. (Def.'s 56.1(a)(3) Statement ¶ 95). After the surgery, Ammons received physical therapy. (Id., at ¶ 96). The residual symptoms Ammons experienced required an evaluation to determine what he was capable of doing at work. (Id., at ¶ 97). As of April 9, 1998, Dr. Krieger concluded and informed Ammons that he had reached the point of maximum medical improvement with regard to his knee condition and that his condition was permanent. (Id., at ¶ 98).

Ammons' knee condition affects him in the following ways: he cannot go up and down stairs like he used to; he cannot play with his grandchildren; his knee bothers him when he is walking, kneeling, or working around the house; his knee swells on him; he cannot go to the grocery store like he used to because it involves walking and pushing a cart; he cannot rake leaves or clean the gutters at his home; he cannot push a lawn mower like he wants to; he cannot stand too long when he goes fishing; he can only drive his car for 50 or 60 miles at a time before he needs to get out and stop and relax; he cannot ride horses anymore; and he cannot cut firewood anymore. (Def.'s 56.1(a)(3) Statement ¶ 105). Since his knee injury, he walks with a limp, it is hard for him to get down on the floor, and he cannot squat and bend on his knee like he used to. (Id., at ¶ 106).

Ammons returned to work on November 17, 1997. His restrictions included a certain amount of climbing, being on his knees for a certain period of time, bending, squatting, going up and down stairs, kneeling, lifting, and going up on a ladder. (Def.'s 56.1(a)(3) Statement ¶¶ 107-108, 137).

12

At this time, he was assigned light duty, which included repairing haul baskets and working in the shop. Haul baskets carry garments through the plant. (Id., at ¶ 140). Malfeo asked Ammons to repair eighteen baskets per day. Ammons informed Malfeo that it was impossible for him to repair that number of baskets per day. (Id., at ¶¶ 8, 141). While on light duty, Ammons' knee became swollen. (Id., at ¶ 142). On December 8, 1997, Ammons voluntarily withdrew himself from his light-duty assignment and went on a leave of absence. (Id., at ¶ 143).

Ammons returned to work in a light-duty capacity on February 14, 1998. (Def.'s 56.1(a)(3) Statement ¶ 144). Between February 13, 1998 and February 16, 1998, Ammons received a functional capacity evaluation at Mercy to determine what he could do. (Def.'s 56.1(a)(3) Statement ¶¶ 109-110). During the evaluation at Mercy, Ammons told the individuals conducting the evaluation that his job entailed kneeling, standing, climbing, walking, and lifting. (Id., at ¶ 111). Ammons also attended work hardening for about two weeks. (Id., at ¶ 112).

On March 16, 1998, Ammons voluntarily withdrew himself from light duty and again commenced a leave of absence. He last worked at the plant on March 13, 1998. (Def.'s 56.1(a)(3) Statement ¶ 145). In April 1998, Aramark offered Ammons a job performing production line functions in a temporary light-duty capacity. Ammons did not accept the position. (Id., at ¶ 146). From May 8, 1998 onward, Aramark considered Ammons to be on medical leave of absence. (Id., at ¶ 147).

In April 1998, Dr. Krieger prepared a report concerning Ammons' medical condition. Based on his medical status and Dr. Krieger's work-capacity evaluation, Ammons was limited to a light-medium level of work. (Id., at ¶ 113). Ammons had the following permanent physical restrictions imposed on him by Dr. Krieger: minimal kneeling on his left knee at no longer than five minutes at

13

a time; static standing limited to eight minutes; dynamic standing to one hour maximum; and limited climbing of stairs, ladders, and scaffolds. Walking was restricted to pain levels, and he could not resume heavy work activity, which would include 100-pound lifting occasionally, 35 pounds or less frequently, and 15 pounds constantly. (Id., at ¶ 115). Pursuant to the April 9, 1998 report, Dr. Krieger opined that Ammons, with his restrictions, could not return to the regular duties of his maintenance position. (Id., at ¶ 116). Dr. Krieger never released Ammons from his restrictions. (Id., at ¶ 118). However, in April 1999, after Ammons' follow-up visit, Dr. Krieger found that "things are somewhat better" and that Ammons should go through another work-capacity evaluation. Dr. Krieger thought that "it is within the realm of possibility that at this time he [Ammons] might be able to return to his regular work activity." A work-capacity or functional-capacity evaluation was required before it could be determined if Ammons could return to his regular work activity. (Plaint.'s 56.1(a)(3) Statement ¶ 19).

In June 1998, Dr. Zarija Djurovic ("Dr. Djurovic"), one of Ammons' treating physicians, placed Ammons on restrictions, restricting him from lifting, bending, pushing, or pulling. (Def.'s 56.1(a)(3) Statement ¶ 148). On June 29, 1998, Ammons reported to work and presented the note from Dr. Djurovic. When Jeffrey Schwingler ("Schwingler"), the General Manager of Plant 701, received the note, he concluded that there was no work available for Ammons to do within those restrictions. (Id., at ¶ 149). Malfeo also tried to find a way to bring Ammons back to work with his restrictions. (Id., at ¶ 151). Malfeo did not see how Ammons could keep working in the maintenance department with his restrictions. (Id., at ¶ 152).

In September 1998, Entenberg interviewed Ammons. At the interview, Ammons informed Entenberg that he had pain from his knee to his hip; he experienced swelling of the knee and ankle;

he used a cane for assistance; and had fallen several times, especially when going down the stairs to the basement of his home. (Def.'s 56.1(a)(3) Statement ¶ 120). Ammons stated that he did not do any housework, laundry, yard work, or house repairs and that he could not hunt, fish, or play ball. (Id., at ¶ 121). He indicated that his functional physical capabilities were: sitting 20-30 minutes with leg stretched; standing less than 5 minutes; walking less than 1 block slowly; lifting 40-50 pounds once or twice from a straight position; painful bending; no squatting; no kneeling; very difficult to climb; he could drive for 30 minutes but had a problem going from the gas pedal to the brake pedal; and his sleep was "up and down". (Id., at ¶ 122). Ammons informed Entenberg that his position at Aramark was considered to be heavy in exertion level and involved frequent bending, climbing, stooping, standing, and walking. (Id., at ¶ 123).

In October 1998, based on her interview with Ammons, a review of his medical records, and her general background, training, and experience, Entenberg prepared a vocational rehabilitation evaluation. (Def.'s 56.1(a)(3) Statement ¶¶ 125-126). Entenberg also consulted the Dictionary of Occupational Titles to form her opinions about Ammons' position with Aramark. (Id., at ¶ 128). Entenberg concluded that Ammons was restricted to a sedentary occupation or a desk job. (Id., at ¶ 130). Ammons' job was not a sedentary position and he was restricted in lifting to light/medium; his other physical restrictions were at the sedentary level. (Id., at ¶¶ 132-133). She concluded that Ammons was not capable of returning to his maintenance engineer position as it was generally performed. Ammons could not perform several aspects of his position involving general repair and maintenance of equipment because of the standing, walking, kneeling, and other physical requirements involved. (Id., at ¶ 135). Given Ammons' physical restrictions at the time of her report, Entenberg knew of no accommodation that would have allowed Ammons to perform the non-

stationary aspects of his position. (Id., at ¶ 136).

In January 1999, Joe Dayton ("Dayton"), Aramark's Director of Labor and Employee Relationships, spoke with Schwingler, the plant general manager, after Dayton received a letter from Ammons' attorney requesting that Aramark provide reasonable accommodations to allow Ammons to return to work. (Def.'s 56.1(a)(3) Statement ¶¶ 6, 153). Following his conversation with Dayton, Schwingler sent an e-mail to Skip Ur ("Ur"), Aramark's Senior Director of Employment Practices, requesting guidance. (Id., at ¶¶ 5, 154). Ur also received a copy of the letter from Ammons' attorney, dated January 11, 1999. A copy of Entenberg's October 6, 1998 report was attached to the letter. (Id., at ¶ 155). The letter also advised Aramark that Entenberg would like to perform an onsite job analysis and requested a face-to-face meeting on the issue of reasonable accommodation. (Plaint.' 56.1(a)(3) Statement ¶¶ 23-24). Ur replied to Schwingler's e-mail by telling him to schedule a meeting with Ammons so that he could provide his input into how he feels he could be accommodated within his restrictions. (Id., at ¶ 156). Ur was aware that he was obligated to engage in an interactive dialogue with Ammons to see if he could be reasonably accommodated. (Id., at ¶ 157).

In response to Ur's e-mail, a meeting with Ammons, Schwingler, and McPherson was held on January 21, 1999. (Def.'s 56.1(a)(3) Statement ¶¶ 158-159). At the meeting, Schwingler asked Ammons to identify the specific job tasks that he was capable of coming back and performing for Aramark. Ammons responded that he could work in the boiler room with some assistance. He also stated that firing up the boiler is a very physical job involving a lot of leg work, that water and gas readings must be taken throughout the plant, that he must climb a ladder to turn the valve, and open the main water supply and feed water pump on the boiler. Ammons believed he could complete

16

these boiler start-up tasks if he were allowed additional time to get the boiler running in the morning. (Id., at ¶ 160). Ammons also stated that he could repair sewing machines and troubleshoot certain equipment. Schwingler asked Ammons if there was anything else he could perform. Ammons stated that he was willing to try anything, but he wouldn't tell Schwingler the specific things he was able to do. (Id., at ¶ 161). Schwingler informed Ammons to continue to think about things he could do and ways that Aramark could potentially accommodate him and to communicate such to Schwingler. (Id., at ¶ 163). Ammons did not make any other suggestions as to how he could do his job with his restrictions. (Id., at ¶ 181).

Schwingler reported the outcome of the January 21, 1999 meeting to Ur. (Def.'s 56.1(a)(3) Statement ¶ 165). During January and February 1999, Ur had conversations with Schwingler, and possibly Malfeo, to try to ascertain if Aramark could reasonably accommodate Ammons. (Id., at ¶ 166). Ur recalls soliciting Malfeo's input on possible accommodations for Ammons. (Id., at ¶ 167). In another conversation Ur had with Schwingler and Malfeo, Malfeo and Schwingler told Ur that they did not need someone to sit at the boiler all day. Furthermore, the few sewing machines in the plant did not brake down often, and the plant did not need a troubleshooter. (Id., at ¶¶ 168, 170). Ur also recalls discussing the duties associated with tending the boiler with Schwingler and Malfeo. Based on the conversation, Ur concluded that, to the extent Ammons needed assistance with any boiler duties because of the climbing involved, Aramark could accommodate him in this regard. (Id., at ¶ 169).

On February 23, 1999, Schwingler, Malfeo, and Ur had a conversation regarding what Ammons could do within his restrictions. In the conversation, they discussed Ammons' being able to open the valves to the boiler but that it would require climbing and would take five to seven

17

minutes a day and could be accommodated by allowing someone else to assist Ammons. They discussed the fact that Ammons needed assistance from Malfeo in order to complete the boiler paperwork and that the boiler work requires about 3.5 to 4 hours per day, and the rest of the work day requires that the individual function as a full-time mechanic. The fact that Ammons had stated that he could not perform other duties of a maintenance mechanic was also discussed.

At the meeting Malfeo indicated to Schwingler that Aramark should consider creating a new job description for Ammons. Schwingler indicated that Aramark did not want to create a new job for Ammons. (Def.'s 56.1(a)(3) Statement ¶ 172). Malfeo understood that Ammons desired to work in a maintenance troubleshooting role because he could not perform the physical requirements of the job. (Id., at ¶ 173). Malfeo did not believe that Ammons could perform his job functions if the doctor's indications of Ammons' restrictions were accurate. (Id., at ¶ 174).

On March 10, 1999, Ammons requested to return to work. (Def.'s 56.1(a)(3) Statement ¶ 175). Following the request, a meeting was held between Schwingler, Ammons, and McPherson. Ammons asked Schwingler to give him a chance to see what work he could accomplish. Ammons informed Schwingler that he could repair sewing machines, do the boiler work duties, repair haul baskets, assist other mechanics, and any other job that came up that he could do with his ability. (Id., at ¶ 176).

In response to Ammons' request to return to work and his request for a written status of his job, Ur wrote Ammons a letter informing him that his physical limitations could not be accommodated. (Def.'s 56.1(a)(3) Statement ¶ 178). Ur considered Entenberg's report and Dr. Krieger's assessment of Ammons' physical restrictions in the process of determining possible accommodations for Ammons. (Id., at ¶ 179). Ur did not consider the decision to be "a close call"

18

as to whether Aramark could accommodate Ammons because Entenberg's report indicated that Ammons was severely and extremely limited and would need a sedentary type of job. (Id., at ¶ 180).

Ur informed Ammons that, to the extent he required the assistance of another person to start-up the boiler, Aramark would accept this request as part of a reasonable accommodation. (Def.'s 56.1(a)(3) Statement ¶ 184). However, Ur did not find Ammons' request to tend to the boiler after start-up a reasonable accommodation because he understood that maintenance employees would normally only spend about four hours per day tending to the boiler and that the remainder of the day would be spent maintaining and repairing equipment in the plant. By simply tending to the boiler and not performing other maintenance and repair duties, Ur believed that Ammons would not be filling the essential functions of his job. (Id., at ¶ 185). Ammons' request to work exclusively on sewing machines was also not a reasonable accommodation because of limited number of machines and the fact that they did not require large amounts of maintenance. (Id., at ¶ 186). Ur also informed Ammons that his request to act as a maintenance consultant/troubleshooter was not a reasonable accommodation because Aramark expects its maintenance staff to be able to perform a variety of maintenance and repair functions and cannot afford the luxury of a maintenance consultant who cannot actually repair equipment himself. (Id., at ¶ 187).

On March 29, 1999, a meeting was held with the union representatives and Ammons regarding Ammons' request to return to work. Dayton, Schwingler, Malfeo, Larry Foster ("Foster"), McPherson, and Ammons were present. (Def.'s 56.1(a)(3) Statement ¶ 188). Dayton informed Ammons that he was on a leave of absence and that, if his status did not change by November 8, 1999, he would be terminated for not returning to work before the expiration of the leave of absence period allowed by the CBA. (Id., at ¶ 189). Dayton also informed Ammons that he could

communicate any changes in his prior requests for accommodation to Aramark. (Id., at ¶ 190). At the conclusion of the meeting, Foster indicated that if Aramark terminated Ammons, the union would file a grievance. Foster also indicated that Ammons would be obtaining a letter from his attorney or physician specifying the job functions Ammons could perform. (Id., at ¶ 191).

On April 7, 1999, Ammons' attorney requested an interactive conference at which both the attorney and Entenberg would be present. The letter also renewed the prior request that Entenberg be permitted to conduct an on-site job analysis of the plant. (Plaint.'s 56.1(a)(3) Statement ¶ 31). Ur did not believe that Ammons' attorney was required to be present at any meetings regarding reasonable accommodations for Ammons. (Def.'s 56.1(a)(3) Statement ¶ 204). Ur also did not think that Ammons would have difficulty speaking for himself at any meeting. (Id., at ¶ 205). Furthermore, Ur believed Entenberg's October 1998 report was extensive and definite and that a visit to the plant by her was unnecessary. (Id., at ¶ 206). Entenberg's October 1998 report did not seek a job site visit. (Id., at ¶ 207).

In October 1999, Ammons received a letter from Aramark explaining that he would be terminated if he was unable to return to work before November 8, 1999. (Def.'s 56.1(a)(3) Statement ¶ 195). After receiving the letter, Ammons filed a union grievance regarding his impending termination. (Id., at ¶ 196). At the time he filed the grievance, Ammons understood that he was restricted to light duty. (Id., at ¶ 197). Aramark responded to Ammons' grievance with a letter that outlined Aramark's position that Ammons was being terminated for failing to return to work within eighteen months. (Id., at ¶ 198). Ammons was terminated on November 8, 1999. (Id., at ¶ 199). The union did not pursue Ammons' grievance to arbitration. (Id., at ¶ 201).

In January 2001, Ammons applied for Social Security Disability benefits on account of his

knee injury. The Social Security Department's records indicated that Ammons became disabled on April 1, 1998. Ammons was approved to receive Social Security Disability benefits and continues to receive such benefits. (Def.'s 56.1(a)(3) Statement ¶ 103); (Plaint.'s Dep. pp. 360-363).

## ANALYSIS

The ADA prohibits covered employers from discriminating "against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is a disabled person "who ... can perform the essential functions" of his job, including those who can do so only "with ... reasonable accommodation." 42 U.S.C. § 12111(8). The plaintiff bears the burden of establishing that he is a "qualified individual with a disability".

To be a "qualified individual, the plaintiff must establish that: (1) he possesses the prerequisites for the job and (2) he can perform the essential functions of the job with or without reasonable accommodation. *See Emerson v. Northern States Power Co.*, 256 F.3d 506, 513 (7th Cir. 2001) (*Emerson*). The determination whether an individual is qualified is made at the time of the employment decision. *See Ross v. Indiana State Teacher's Ass'n Ins. Trust*, 159 F.3d 1001, 1013 (7th Cir. 1998).[1]

The parties do not dispute that Ammons' knee injury constitutes a disability under the ADA. The above undisputed facts, including those contained in Entenberg's and Dr. Krieger's reports,

---

[1]Aramark initially argues that summary judgment is proper because Ammons filed and receives Social Security Disability benefits. However, the mere filing and receipt of Social Security Disability benefits in the instant case does not mandate summary judgment because Ammons argues that he could perform his past work if Aramark made reasonable efforts to accommodate his disability which is not considered when the Social Security Administration determines Social Security Disability benefits. *See Lee v. City of Salem, Indiana*, 259 F.3d 667, 675 (7th Cir. 2001).

demonstrate that Ammons is disabled under the ADA. *See* 42 U.S.C. § 12202(2); 29 C.F.R. § 1630.2(g) (a disability encompasses a "physical or mental impairment that substantially limits one or more of the major life activities").

The parties also do not dispute that Ammons possessed the prerequisites for the boiler/maintenance engineer position, and the above facts support this finding.

The parties do dispute whether Ammons could perform the essential functions of his job with or without reasonable accommodation.

An essential function of a job is a fundamental job duty required of a person in the job the plaintiff holds or desires. *See* 29 C.F.R. § 1630.2(n)(1). Factors taken into account when determining whether a job duty is an essential function include: (1) the job description, (2) the employer's opinion, (3) the amount of time spent performing the function, (4) the consequences for not requiring the individual to perform the duty, and (5) the past and current work experiences. *See Emerson*, 256 F.3d at 512-13.

The above undisputed facts establish that the essential functions of Ammons' position included the maintenance and repair of virtually all of the equipment in the plant. This equipment included the boilers, levelators, washers, dryers, ironers, conveyors, overhead piping, presses, fans, and pumps. Some of these pieces of equipment were critical to the business, and the failure to properly maintain or repair such equipment could result in a plant shutdown. In addition, the position required maintaining the plant and grounds themselves. Furthermore, it is undisputed that these essential functions required frequent standing, climbing, and walking, some kneeling and the need to be able to work in small areas. It is undisputed that the position was heavy in exertion level and required significant physical capabilities.

22

In an attempt to demonstrate that Ammons could perform the essential functions of his job, Ammons cites to the deposition testimony of Malfeo in which Malfeo stated that, in his personal opinion, Ammons could perform 98.5% of his job. However, Ammons ignores that Malfeo further explained the statement as being his personal opinion, without regard to the restrictions, and that it was based on his knowledge of Ammons and the fact that Malfeo thought that Ammons would "try to do all those things". Contrary to Ammons' argument, Malfeo agreed that Ammons was unable to perform the functions of his position with the restrictions. Accordingly, Ammons' argument is without merit. *See Koshinski v. Decatur Foundry, Inc.*, 177 F.3d 599, 602 (7th Cir. 1999) (plaintiff "cannot make a case out of a single statement taken out of context").

The above undisputed facts establish that Ammons was not able to perform the essential functions of his position with or without reasonable accommodations. Both Dr. Krieger's and Entenberg's reports indicated that Ammons was restricted in daily activity, including walking, climbing, stooping, and kneeling. Entenberg concluded that Ammons was restricted to a sedentary occupation or a desk job and that he was not capable of returning to his maintenance engineer position as it was generally performed. Dr. Krieger's April 1998 report concluded that Ammons, with his restrictions, could not return to the regular duties of his maintenance position.

Defendant argues that Ammons was also not a qualified individual because there were no reasonable accommodations that would have allowed Ammons to perform the essential functions of his job.

In the instant case, Ammons proposed reasonable accommodations, including tending to the boiler with some assistance, sewing machine repair, and consulting with other maintenance individuals on troubleshooting of equipment. Aramark agreed that it was a reasonable

accommodation to have Ammons tend to the boiler with someone to assist him. However, tending to the boiler would have only constituted half of Ammons' work day. In addition, while repairing the sewing machines was a reasonable accommodation, the small amount of work generated for such is minimal and would not have been sufficient to keep Ammons working on a continuous basis. Furthermore, Aramark was not able to have Ammons consult and troubleshoot because the needs of the plant require the boiler engineer to be able to maintain and repair virtually all of the equipment in the plant, which Plaintiff concedes he cannot do. Ammons did not offer any other suggestions.

In essence, Ammons was seeking to have Aramark change the essential functions of the position to accommodate his knee injury. "An employer is not obligated to change the essential functions of a job to accommodate an employee." *Emerson*, 256 F.3d at 514; *see also Dvorak v. Mostardi Platt Assoc., Inc.*, 289 F.3d 479, 484 (7th Cir. 2002) (employer is not required to modify, reduce, or reallocate essential functions of a job to accommodate an employee); *Jay v. Internet Wagner, Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000) (employer is not required to shuffle job duties amongst employees to create a position to accommodate an employee). Based on Ammons' uncontested limitations and restrictions and the absence of reasonable accommodations that would have allowed Ammons to complete the essential functions of his position, Ammons was not a qualified individual with a disability; and summary judgment in favor of Aramark is proper.

In an attempt to avoid summary judgment in favor of Aramark and have summary judgment granted in his favor, Ammons argues that summary judgment in his favor is proper because Aramark did not engage in an inactive process to determine what reasonable accommodations were possible.

Part of the reasonable accommodation duty requires that an employer engage in an interactive process with the disabled employee needing accommodation so that, together, the employer and

employee can identify the employee's needs and discuss accommodation options. *See Emerson*, 256 F.3d at 515. "However, an employer's failure to engage in the interactive process or causing the process to breakdown by itself is insufficient to support liability." *Emerson*, 256 F.3d at 515. Instead, "the (only) consequence of the employer's failing to consult with the employee concerning a possible accommodation of the employee's disability is to shift the burden of production concerning the *availability* of a reasonable accommodation from the employee to the employer." *Mays v. Principi*, 301 F.3d 866, 870 (7th Cir. 2002).

Ammons argues that Aramark failed to engage in an interactive process because it did not schedule a meeting with Aramark management, Ammons, Ammons' counsel, and Entenberg, as requested by Ammons' attorney. However, an interactive process had already been held before Ammons' attorney requested another meeting. At this meeting, Aramark management and Ammons had a face-to-face discussion of Ammons' disability, restrictions, and possible reasonable accommodations. Ammons was informed to advise Aramark if he became aware of any additional reasonable accommodations; none were ever provided. Therefore, Aramark did engage in an interactive process as required by the ADA.

Furthermore, assuming argumendo, that another interactive process was required and that Aramark was required to allow Ammons' attorney and Entenberg to attend (as argued by Ammons but not supported by citation to any case law holding such), summary judgment in Ammons' favor is still not appropriate. The lack of an interactive process only shifts the burden of production to the defendant concerning the availability of reasonable accommodations. As demonstrated by the above undisputed facts, Aramark made a determination that some reasonable accommodations could be made, but such accommodations would not have allowed Ammons to complete the essential

functions of his position. In light of the information known to Aramark at the time of its decision, including Dr. Krieger's and Entenberg's reports that indicated severe restrictions placed on Ammons' physical capabilities and their conclusions that Ammons could not work as a boiler engineer, along with Ammons' admissions that he was unable to stand, walk, climb, stoop, or kneel to the extent required by his position, Aramark has demonstrated that no other reasonable accommodations (other than those offered by Ammons) were available. Accordingly, Ammons' argument would still fail.

## CONCLUSION

For the reasons stated, Defendant's Motion to Strike the Testimony of Susan Entenberg and Portions of Plaintiff's Local Rule 56.1(b) Response is granted. Plaintiff's Motion for Summary Judgment is denied. Defendant's Motion for Summary Judgment is granted.

Dated: December 5, 2002

JOHN W. DARRAH
United States District Judge